Brad M. REISS, Plaintiff–Appellant,

v.

SOCIÉTÉ CENTRALE DU GROUPE DES ASSURANCES NATIONALES, a/k/a Société Centrale du Gan, n/k/a Société de Gestion de Garanties et de Participations, and GAN S.A., Defendants–Appellees,

Union Pour Le Financement D'Immeubles De Sociétés and Union Industrielle De Credit, Defendants.

No. 00–7103.

United States Court of Appeals, Second Circuit.

Argued: Sept. 22, 2000.

Decided: Dec. 27, 2000.

Richard E. Haftel, Modlin, Haftel & Nathan LLP, New York, NY, for plaintiff-appellant.

Lawrence W. Newman, Baker & McKenzie, New York, NY, for defendant-appellee Société Centrale du Groupe des Assurances Nationales, a/k/a Société Centrale du GAN, n/k/a Société de Gestion de Garanties et de Participations.

Frederick T. Davis, Shearman & Sterling, New York, NY (Jeremey R. Kasha, on the brief), for defendant-appellee GAN S.A.

Before: CARDAMONE, MINER, and POOLER, Circuit Judges.

MINER, Circuit Judge:

## I.

Plaintiff-appellant Brad M. Reiss appeals from a judgment entered against him in the United States District Court for the Southern District of New York (Scheind-lin, *J.*) dismissing his action to recover a finder's fee against defendants-appellees. The action revolves around Reiss' claim that he is entitled to a fee for having successfully interested General Electric Capital Corporation ("GECC") in acquiring two French real estate companies, Union Pour le Financement d'Immeubles de Sociétés ("UIS") and Union Industrielle de Credit ("UIC"). Reiss claims that he entered into an oral contract with Alain Juliard, the Chairperson of UIS, to find a buyer for UIS and UIC in exchange for a commission of 1% of the value of the transaction. The Amended Complaint pleads causes of action in breach of contract and quantum meruit. The district court dismissed the action for lack of personal jurisdiction, *see* Fed.R.Civ.P. 12(b)(2), and failure to state a claim, *see* Fed.R.Civ.P. 12(b)(6), holding that Reiss did not establish that either defendant-appellee transacted any business in the State of New York so as to be subject to personal jurisdiction there or that the alleged agent of defendants-appellees had actual or apparent authority to contract with him and that a claim therefore was not stated in the complaint.

## II.

According to the Amended Complaint, Reiss is a licensed real estate broker who has been engaged in the commercial real estate business for more than fifteen years. UIC, at the times relevant to this dispute, was a financial institution that held a substantial real estate portfolio. Defendant-appellee Société Centrale du Groupe des Assurances Nationales, also known as, Société Centrale du GAN, and now known as, Société de Gestion de Garanties et de Participations ("Société"), is wholly owned by the government of France. Defendant-appellee GAN S.A. ("GAN S.A."), a holding company, is currently the parent of a group of French companies involved in the insurance business.

In 1992, the year that the alleged oral contract was formed, GAN S.A. was a wholly owned subsidiary of Société. GAN S.A., in turn, wholly owned UIC. GAN S.A. also owned 94.47% of UIS. In 1997, prior to the sale of UIC and UIS to GECC, GAN S.A.'s shares of UIC were transferred to Société. UIS, together with FINABAIL, another company owned by GAN S.A., and two other companies—all of which were involved in real estate—were collectively known as Groupe Percier.

Reiss, a resident of New York, has had an almost twenty-year personal and professional relationship with Alain Juliard, the Chairperson of UIS. In April 1992, Reiss, on behalf of his firm's client United States Surgical Corporation ("USSC"), arranged for UIS to provide approximately 483,910,000 French francs in financing to USSC for its European headquarters and distribution and training facility near Paris. During the transaction, Reiss told Juliard that his (Reiss') firm, Sonnenblick–Goldman, expected to receive from USSC a 1% fee—its customary arrangement—for its work in that kind of transaction. At the close of the transaction, Reiss sent a copy of Sonnenblick–Goldman's bill to Juliard, who assisted him in collecting the fee from USSC.

On July 28 or 29, 1992, Juliard visited New York in connection with the USSC transaction. As Juliard, Reiss, and UIS' Financial Director, Philippe Rosio drove back from a meeting, Juliard advised Reiss that "GAN"[1] had authorized Juliard to explore opportunities to reduce the real estate holdings of "GAN" in France, including the position of "GAN" in UIS and/or FINABAIL. Prior to this drive, Juliard had repeatedly told Reiss that, before he undertook any actions with respect to any important matters, "GAN" required him to obtain its approval. During the drive, Juliard explained that defendants' objective was to have a United States corporation make a "substantial investment"

in UIS and/or FINABAIL. Defendants believed that the best way to accomplish this end was to convince a United States corporation to enter into a joint venture with defendants or make an initial investment in UIS and/or FINABAIL, which would allow the United States corporation to become familiar with the holdings of "GAN" and the French real estate market.

Juliard and Reiss then allegedly entered into an oral contract. That agreement, which was never reduced to writing, was made when Juliard told Reiss that "GAN" would like to retain Reiss to find one or more United States corporations to participate in transactions with defendants and/or to acquire an interest in the holdings of "GAN" in UIS and/or FINABAIL. Reiss accepted upon Juliard's commitment that if he succeeded in introducing a company that ultimately entered into a transaction with "GAN", "GAN" would pay his fee of 1% on any large transaction, a fee similar to that paid in the USSC transaction.

Reiss alleges that he subsequently began performing services that ultimately led to the purchase of UIC and UIS by GECC. Initially, Reiss contacted Richard Grimaldi, an executive in GECC's Real Estate Division with whom he had a close professional relationship, in an attempt to interest GECC in reentering the French commercial real estate market by participating in transactions with, or acquiring an interest in, Groupe Percier. Juliard and Rosio, in consultation with Reiss, decided to encourage GECC, as an initial matter, to acquire the shares of "GAN" in FINABAIL, with the hope that such transaction would lead to other deals or a more substantial investment by GECC in Groupe Percier.

In a subsequent conversation between Grimaldi and Reiss, Grimaldi suggested that Groupe Percier submit a written presentation for him to circulate within

---

1. In the Amended Complaint, Reiss does not distinguish between GAN S.A. and Société. Rather, he refers to "GAN" and "defendants" as inclusive of both GAN S.A. and Société.

GECC. Rosio, in consultation with Reiss, prepared a written presentation relating to an investment in FINABAIL by GECC. Reiss delivered the presentation to Grimaldi and later provided Grimaldi with a copy of UIS' annual report that he received from Rosio. In addition, around the same time, Reiss contacted approximately two hundred other American companies that had invested or planned to invest in France in an attempt to interest them in Groupe Percier's activities.

Sometime in July 1993, Reiss joined Allied Partners, Inc., a company formed to manage and invest in real estate. In September 1993, following Grimaldi's expression of GECC's interest in pursuing a transaction with defendants, Reiss arranged a meeting in New York among himself, Juliard, Rosio, Grimaldi, and Richard H. Powers, Managing Director of Commercial Property Financing for GECC in Europe. Prior to the meeting, while Juliard, Rosio, and Reiss discussed strategy, Juliard informed Reiss that "he had spoken to 'GAN' about UIC, and 'GAN' had communicated to Juliard that 'GAN' wanted Juliard, on behalf of 'GAN' and UIC, to seek to interest GECC in the acquisition of part or all of UIC," either for its own business or as a means to acquiring UIS. Juliard then allegedly explained that "GAN" would be extremely pleased with any interest GECC might take in any part of UIC, and asked Reiss, pursuant to Reiss' engagement, to help UIC, "GAN," and Juliard stimulate GECC's interest in an acquisition in UIC as well as UIS. At the meeting, Rosio and Juliard presented to GECC the prospect of acquiring an interest in UIS and FINABAIL, possibly through the acquisition of an interest in UIC.

A few months later, Reiss and Juliard purportedly agreed that Reiss, in representing Groupe Percier's interests, would operate under the joint name "Groupe Percier–Allied Partners," which listed its address as Reiss' office in New York. Prior to agreeing to this arrangement, Juliard

and Rosio informed Reiss that they had obtained the required approval from "GAN" in order to proceed in this manner. Shortly thereafter, Juliard informed Reiss that "GAN" had authorized Reiss to open a bank account in the name of Group Percier–Allied Partners in New York, which Reiss subsequently opened at Chase Manhattan Bank.

Between October 1993 and March 1994, defendants and GECC had periodic discussions by telephone and at meetings in Europe regarding a potential GECC acquisition of UIC and/or UIS stock. Juliard and Rosio kept Reiss apprised of these dealings, sending him copies of correspondence between Groupe Percier and GECC. In April 1994, GECC executed confidentiality letters, which had been approved by "GAN," relating to information about UIS and UIC. During this time, Juliard and Rosio also instructed Reiss to continue soliciting other potential investors and provided him with UIS dividend information.

On June 1, 1994, at the request of Rosio, Reiss attended a meeting in New York among Michael Fraizer, a senior officer of GECC's Real Estate Division, Juliard, and Rosio. Subsequently, at the request of Juliard and Rosio, Reiss attended a meeting on September 13, 1994, at the Hotel Vernet in Paris among Fraizer, Powers, Juliard, Rosio, Arline Gaujal, a director of UIS, and Guy de Chavanne, the Director General of GAN S.A. and Director General of Société. At this meeting, GECC's potential investment in UIS and UIC was discussed. Juliard, Rosio, and Gaujal met with Reiss in New York in October 1994 to discuss, among other things, matters involving GECC.

Juliard and Rosio also sought assistance from Reiss in other transactions with GECC. In contemplation of a potential joint GECC/Groupe Percier investment in Silic, a real estate investment company, Reiss accompanied GECC representatives to Paris in July 1994. Rosio encouraged Reiss to use this opportunity to "present to [GECC] the real estate assets of

[UIC]." Reiss also accompanied Grimaldi and Powers to Paris in September 1995, at defendants' request and as UIS' representative, to review documents related to a potential acquisition by GECC of a portfolio of property and loans owned by Barclays Bank. In the fall of 1995, Reiss, in conjunction with Rosio, also aided GECC in the preparation of a study of the French real estate market.

Reiss continued to speak frequently with Grimaldi, attempting to maintain GECC's interest in the UIS and UIC transactions, and also spoke regularly with Juliard and Rosio. Reiss alleges that, from 1993 to February 1997, he devoted a substantial portion of his time to promoting defendants' interests and represented no other clients. In mid–1996, as it appeared increasingly likely to Reiss and Juliard that GECC would acquire an interest in UIS and/or UIC, Reiss arranged for Juliard and Rosio to meet with legal counsel in New York. On July 25, 1996, while Juliard and Rosio were in New York, Rosio purportedly acknowledged that Reiss would be entitled to his fee when the deal was accomplished.

In February 1997, "GAN" publicly announced a restructuring plan that included selling its interest in UIS and UIC. The plan was approved in July 1997. Pursuant to the requirements of French law, "GAN" retained Lazard Freres as a financial advisor to make information relating to UIS and UIC available for inspection and to solicit bids for the sale of the companies.

Starting in July 1997, at Juliard's request, Reiss contacted other potential investors, and was successful in generating interest from The Blackstone Group, an investment firm. Blackstone sought reassurance that any fee due Reiss arising from the transaction would be paid by defendants. Thus, on September 17, 1997, Reiss wrote to Juliard and Rosio to confirm that Reiss would be entitled to his usual and customary fee of 1% if UIS entered into a deal with Blackstone. Although Rosio initially attempted to shift responsibility for payment of Reiss's 1% fee to Blackstone, at no time did Juliard or Rosio ever object to the amount of the fee or Reiss's entitlement thereto. Shortly thereafter, Rosio and Juliard agreed that because, as Reiss noted, he had always represented UIS for the past 4 years, defendants, not Blackstone, were responsible for Reiss' fee.

In late 1997, Grimaldi informed Reiss that GECC had agreed to acquire UIS and asked Reiss how much he was getting paid for his role in the transaction. Reiss then sent an invoice, dated January 7, 1998, addressed to Juliard, Rosio, Powers, and Ronald Pressman, President of Commercial Real Estate at GECC, for $1 million. At that time, Reiss was unaware of the amount of the UIS transaction or the fact that GECC was acquiring an interest in UIC in addition to UIS. In a letter responding to the invoice, Juliard conceded that Reiss had introduced him and Rosio to Powers in 1993 and that, out of courtesy, they had kept Reiss informed of their relationship with GECC. He asserted, however, that Reiss' involvement was "essentially limited just to that introduction" and denied that Reiss was owed any fee in connection with the GECC/UIS transaction.

According to the Amended Complaint, on May 29, 1998, GECC acquired the shares of "GAN" in UIS for approximately $750 million. Thereafter, on June 15, 1998, GECC, in a joint venture with Goldman Sachs/Whitehall Partners, acquired UIC in a deal valued at approximately $350 million. Reiss received no fee in connection with either of these transactions.

Subsequently, Reiss brought an action in the United States District Court for the Southern District of New York on November 20, 1998, against UIS, UIC, and Groupe des Assurances Nationales, alleging breach of contract, quantum meruit, and unjust enrichment, and seeking damages for "not less than $11 million." Reiss then filed an Amended Complaint on Janu-

ary 29, 1999, eliminating the claim for unjust enrichment and replacing Groupe des Assurances Nationales, a non-existent corporation, with Société and GAN S .A.

## III.

With respect to the breach of contract claim, Reiss alleged in the Amended Complaint that "[d]efendants entered into an agreement with Reiss to retain Reiss as a finder for an agreed upon fee of 1% of the value of any successfully completed large transaction" and that "Reiss performed all services required under the agreement." Asserting that his efforts culminated in the transaction with GECC, Reiss claimed entitlement to the fee. With respect to the quantum meruit claim, Reiss alleged that "[d]efendants authorized Reiss to perform specific valuable services for defendants and Reiss performed in good faith [such] services," that defendants solicited, received, and accepted substantial benefits from the services, and that "Reiss justifiably and reasonably expected defendants to compensate him."

Defendants UIC, Société, and GAN S.A. moved to dismiss the action, asserting that the district court lacked personal jurisdiction over them and that Reiss had failed to state a claim upon which relief may be granted.[2] Before ruling on the motion, the district court held a conference on June 10, 1999, in which it ordered the parties to submit letters to the court referring to "appropriate pages" from Reiss' deposition relating to the entity Reiss thought Juliard was representing when the two contracted for Reiss' finder's fee. The district court then considered the motion of defendants-appellees after submission of these letters but before the completion of discovery, most notably the discovery consisting of the depositions of Juliard and de Chavanne. At the conference of June 10, the district court had acknowledged the impor-

tance of the testimony of these two French executives to the resolution of the issues in this case.

## IV.

The district court dismissed the Amended Complaint as to Société, GAN S.A., and UIC ("the non-UIS Defendants"), after concluding that Reiss had failed to establish personal jurisdiction over those entities under New York's long-arm statute. *See Reiss v. GAN S.A.,* 78 F.Supp.2d 147, 158–60 (S.D.N.Y.1999). The district court also concluded that Reiss had failed to state a claim against the non-UIS Defendants, reasoning that his Amended Complaint was lacking in allegations that Juliard had actual or apparent authority to act on behalf of any of the non-UIS Defendants. *See id.* at 160–62.

After first noting that a district court must apply the forum state's long-arm statute in a diversity case and that due process mandates that a defendant's contacts with a state must be sufficient to provide a fair and reasonable basis for personal jurisdiction, the district court proceeded to an analysis of section 301 of the New York Civil Practice Law and Rules. *See id.* at 158. The district court observed that, in order to invoke jurisdiction against a foreign corporation under section 301, the corporation must be engaged in business in New York on a continuous and systematic basis. *See id.* The court found that "[p]laintiff has not alleged that the non-UIS Defendants have any office or place of business in New York, that they engage in any business in New York or that they have any personnel engaging in any business in New York." *Id.* The allegations "that 'GAN' owns three subsidiaries licensed to do business in New York" and that "GAN S.A.'s web page states that it is 'present in 20 countries,'" *id.* at 158–59, were considered insufficient

---

**2.** Defendants UIS, UIC, Société, and GAN S.A. also moved to dismiss the action on the ground that an oral contract for a broker or finder's fee in this situation is barred by the

Statute of Frauds. That issue is not before us on the instant appeal, and UIS and UIC are not parties to this appeal.

to demonstrate the necessary interconnection between the subsidiaries and the parent corporation. Accordingly, the district court rejected the section 301 argument for personal jurisdiction through subsidiary activities for failure to allege "facts suggesting that the subsidiaries licensed in New York are agents or departments of any of the defendants." *Id.* at 159.

Turning to the assertion of jurisdiction under section 302, which requires a showing that the plaintiff's cause of action arose out of business transacted in the state, *see* N.Y. C.P.L.R. 302(a)(1) (McKinney 2000), the district court examined the question of whether any of the non-UIS Defendants purposefully availed themselves of the privilege of conducting business activities in New York. *See Reiss,* 78 F.Supp.2d at 159. In this regard the court noted that "[t]he only interaction Reiss had with any representative of any of these defendants was the meeting with Guy de Chavanne at the Hotel Vernet in France." *Id.* With respect to the part played by Juliard, the district court found that Reiss had not alleged sufficient facts to prove that the non-UIS Defendants engaged in any activities that clothed him with the apparent authority to make a finder's fee agreement with Reiss. *See id.* at 162. Acknowledging Reiss' argument that Juliard had the actual authority to bind the defendants, the court found that the Amended Complaint did not support that argument because it did not distinguish among the various GAN entities, merely identifying "GAN" as the entity that authorized Juliard to act on its behalf. *See id.* at 160. The district court agreed with the defendants "that it would offend due process to allow Reiss to subject multiple foreign defendants—who have never entered New York—to a suit here in order to determine if, in fact, Juliard was acting as the agent of any of the non-UIS Defendants and, if so, what was the precise scope of that authority." *Id.*

Dismissal for failure to state a claim was granted for the lack of pleading allegations adequate to demonstrate that Juliard had actual or apparent authority from the non-UIS Defendants to enter into an oral finder's fee agreement with Reiss. The basis for Reiss' claim of actual authority was the allegation that Juliard had represented that "GAN" had authorized him to find a buyer for UIS and UIC and his statement that he had to obtain approval from "GAN" as to all important matters. *See id.* at 161. The district court rejected this basis for a finding of actual authority, observing that an alleged agent cannot confer authority upon himself and that affirmative acts on the part of the principal must be demonstrated. *See id.* The court identified another deficiency in this regard: the "conspicuous absence of any allegation that 'GAN' authorized Juliard to retain a 'finder' in connection with his efforts to locate [a] buyer." *Id.*

Applying the rule that apparent authority requires a principal to communicate by words or conduct to a third party the agent's authority to enter into a transaction, the district court found that "Reiss has not pled any facts to support a finding that the non-UIS Defendants cloaked Juliard with the apparent authority to enter into a finder's fee agreement." *Id.* at 162. Although Reiss contended that Juliard had express and implied authority to enter into the finder's fee agreement with him, the court observed that "[p]laintiff does not allege or argue that any representative of [the non-UIS] defendants ever had any communication with him." *Id.* The court also noted that the allegations that "GAN" approved the use of the name "Groupe Percier–Allied Partners" by Reiss, that "GAN" reviewed a confidentiality agreement relating to UIS and UIC, and that the meeting at the Hotel Vernet in Paris attended by Reiss and the principal players in the ultimate sale, all related to matters that followed the alleged oral agreement and therefore had no bearing on whether Juliard had apparent authority to make the agreement. *See id.* at 162 n. 12.

In accordance with the foregoing, the motion to dismiss as to UIS (of which Juliard was chairperson) was denied, but the motion was granted as to GAN, S.A., Société, and UIC. In the same ruling, the district court denied Reiss' motion to add two more "GAN" defendants. The court concluded its opinion as follows: "If Reiss discovers facts supporting a finding that any of the dismissed or new defendants gave Juliard the authority to enter into the finder's fee agreement on its behalf, Reiss will be permitted to amend the Amended Complaint to add that party as a defendant." *Id.* The Opinion and Order of the district court was entered on July 29, 1999.

## V.

Apparently, Reiss discovered no new facts that would enable him to amend his Amended Complaint, because the docket sheet shows no further application by Reiss to the district court. The docket sheet does show that on January 27, 2000, a Stipulation and Order dismissing the action as against UIS and UIC was "so ordered" in the district court. A Notice of Appeal dated January 28, 2000 was filed by Reiss on February 2, 2000. The Notice of Appeal recites that the appeal is from the Opinion and Order "entered on July 29, 1999 (which order became appealable on January 24, 2000)" to the extent that the Order dismissed the complaint against GAN S.A. and Société. The date of January 24, 2000 that is set forth in the Notice of Appeal apparently refers to the date that the Stipulation and Order of Dismissal as against UIC and UIS was so ordered.

Since we were not favored with a copy of the Stipulation in the joint appendix, we were constrained to retrieve it from the office of the district court clerk in our effort to determine how or why the Order appealed from "became appealable" on January 24.

## VI.

■ We are first presented with the question of whether this court has appel-late jurisdiction over this appeal. Although neither briefed nor brought to our attention by the parties, the question arises from the fact that no final judgment ever was entered in this case. The Notice of Appeal gives notice that the appeal is from an Opinion and Order entered on July 29, 1999. The Notice would of course be untimely if a final order or judgment had been entered on that day, since it was not filed until approximately six months later. *See* Fed.R.App.P. 4(a)(1). Moreover, the Opinion and Order was not appealable under the final judgment rule, *see* 28 U.S.C. § 1291, or any of the exceptions thereto, *see* 28 U.S.C. § 1292; *Kahn v. Chase Manhattan Bank, N.A.*, 91 F.3d 385, 387–89 (2d Cir.1996), since it did not dispose of the action as against UIS and left the Amended Complaint open to further amendment. Finally, there was a failure to comply with Federal Rule of Civil Procedure 58, which requires that "[e]very judgment shall be set forth on a separate document" and that "[a] judgment is effective only when so set forth and when entered" by the district court clerk in the civil docket book pursuant to Federal Rule of Civil Procedure 79(a).

By referring in the Notice of Appeal to the Opinion and Order that "became appealable on January 24, 2000," we assume that Reiss meant to appeal from a final judgment of that date, even though no formal judgment was entered. After dismissal of the claims that were covered by the stipulation "so ordered" on January 24, 2000, there remained in the case only Société and GAN S.A. as prevailing defendants in the Opinion and Order referred to. It apparently is Reiss' contention that the Opinion and Order *became* an appealable final judgment as to Société and GAN S.A. on the date that UIC and UIS were removed from the case and that the appeal therefore was filed on a timely basis. Despite the irregularities described above, we agree with this contention.

With the filing of the Order dismissing the action as against UIS and UIC, and with Reiss' presumed waiver of his right to seek a further amendment of the Amended Complaint, we see no reason not to treat the Opinion and Order as a final judgment in favor of Société and GAN S.A. as of the date of docketing of the "so ordered" stipulation, January 27, 2000.[3] A final judgment "is one that ends the litigation, leaving no issues unresolved between any of the parties." *MacEwen Petroleum, Inc. v. Tarbell*, 136 F.3d 263, 264 (2d Cir.1998). After the entry of the Opinion and Order giving rise to this appeal, no issues remained unresolved between any of the parties to this action.

The fact that a formal judgment was not filed prior to the filing of the Notice of Appeal does not affect the timeliness of the appeal because "[a] notice of appeal filed ... before the entry of the judgment or order [ ] is treated as filed on the date of and after the entry." Fed.R.App.P. 4(a)(2). The formal judgment in this case may be filed in the district court at any time. For the purpose of this appeal, the appellees here, by not objecting, have waived the requirement of Federal Rule of Civil Procedure 58 for the filing of a separate document setting forth the judgment. We have noted that appellate jurisdiction may exist despite the lack of a separate judgment: "Where an order appealed from clearly represents a final decision and the appellees do not object to the taking of an appeal, the separate document rule is deemed to have been waived and the assumption of appellate jurisdiction is proper." *Selletti v. Carey*, 173 F.3d 104, 109–10 (2d Cir.1999). We think that the Stipulation and Order dismissing UIS and UIC from the case, as of the date it was filed, January 26, 2000, transformed the Opinion and Order subject of this appeal into a final judgment as of that date.

---

**3.** We presume Reiss' waiver because there is no indication that he ever sought a further amendment and because he filed the Notice of Appeal.

## VII.

■■ We now turn to the issue of jurisdiction as regards Société and GAN S.A., and it is here that we find error in the analysis undertaken by the district court. The initial question to be answered in this case is not whether there is personal jurisdiction within the meaning of the New York Civil Practice Law and Rules but whether there is subject matter jurisdiction within the meaning of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA"). Constrained only by constitutional due process considerations, personal jurisdiction under the FSIA "equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir.1991). No service of process challenge has been mounted in this case. Accordingly, subject matter jurisdiction under the FSIA, an issue apparently presented to the district court but not addressed by it, must be the object of our inquiry here.[4] The parties seem to agree in their briefs that the issue was presented, but the absence of the actual moving papers in the appendix impels us to warn the bar once again of the hazards of an incomplete appendix. *See Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 407 (3d Cir.1980).

"[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court...." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). It is undisputed that Société and GAN S.A. are foreign states within the meaning of the FSIA. *See* 28 U.S.C. § 1603(a) ("A 'foreign state' ... includes ... an agency or instrumentality of a foreign state ...."); *see also Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1026–27 n. 4 (2d Cir.1996). Although the

---

**4.** We say "apparently presented" because the joint appendix does not include the moving papers that were presented to the district court.

FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, it does allow for the exercise of such jurisdiction in cases that fall within several statutorily defined exceptions. As Société recognizes in its brief, the only arguable exception upon which Reiss may rely is the "commercial activity" exception, and it provides that a foreign state is not immune from any suit in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes direct effect in the United States.

*Id.* § 1605(a)(2).

■ The exception upon which Reiss' action is based is "commercial activity carried on in the United States by [a] foreign state," namely Société and/or GAN S.A. The Supreme Court teaches that the "action must be 'based upon' some 'commercial activity' by [a defendant] that had 'substantial contact' with the United States within the meaning of the [FSIA]." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); *see also* 28 U.S.C. § 1603(3) (defining "commercial activity carried on in the United States by a foreign state"). To sustain jurisdiction on this basis, there must be "a significant nexus ... between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." *NYSA–ILA Pension Trust Fund v. Garuda Indonesia*, 7 F.3d 35, 38 (2d Cir.1993). Intended by Congress to be included in the definition of commercial activity are "[a]ctivities such as a foreign government's ... employment or engagement of laborers, clerical staff or public relations or *marketing agents* ...." H.Rep. No. 94–

1487, at 16 (1976) *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 (emphasis supplied). The question here is whether Reiss can demonstrate a significant nexus between his engagement by Société and/or GAN S.A. as a marketing agent in the United States and his action to recover a finder's fee for the deal that culminated in the sale of UIC and UIS by Société to GECC.

■ That question cannot be resolved without a determination as to whether Reiss was in fact retained by Société and/or GAN S.A., a determination that the district court made somewhat prematurely in the context of resolving personal jurisdiction under the New York long-arm statute. Examining only the Amended Complaint and excerpts of the Reiss deposition, the court concluded that Reiss failed to make a prima facie showing that Société and/or GAN S.A. was involved in a continuous course of business in New York either on its own or through subsidiaries. It also concluded that Reiss did not sufficiently allege that Société and/or GAN S.A. transacted in New York the business giving rise to the action, namely the engagement of Reiss as a marketing agent. However, the Amended Complaint and Reiss' deposition are replete with references to dealings with Juliard. Although Juliard was the chairperson of UIS, it may very well be that he acted on behalf of Société and/or GAN S.A. in his dealings with Reiss, whose claim basically is that he was hired by Juliard on behalf of Société and/or GAN S .A. and performed services that led to the sale of UIS and UIC to GECC. According to the Amended Complaint, Société and/or GAN S.A. accepted and benefitted from his services and are liable in quantum meruit as well as contract.

## VIII.

We think that it would be helpful to have the depositions of Juliard and de Chavanne, the latter of whom was not only the Director General of Société but of

GAN S.A. as well, to assist the court in undertaking an FSIA jurisdiction analysis. In any event, Reiss already has been granted permission to pursue discovery of these individuals, but the motion to dismiss intervened. Reiss should be permitted to go forward with the discovery to which he is entitled. We have stated that, "on a challeng[e][to] the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *See Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 932 (2d Cir.1998) (internal quotation marks omitted) (alteration in original). We think it essential for the district court to afford the parties the opportunity to present evidentiary material at a hearing on the question of FSIA jurisdiction. The district court should afford broad latitude to both sides in this regard and resolve disputed factual matters by issuing findings of fact. *See id.*

It seems to us that the question of Juliard's actual or apparent authority to act for Société and/or GAN S.A. in its dealings with Reiss is inextricably intertwined with the issue of FSIA jurisdiction. To find a significant nexus between Société's and/or GAN S.A.'s commercial activity in this country in its dealings with Reiss and Reiss' cause of action for a finder's fee requires a determination that Juliard had actual or apparent authority to act on behalf of Société and/or GAN S.A. The evidentiary material that sheds light on FSIA jurisdiction will also shed light on this matter. For now, it is sufficient to observe that the Amended Complaint does state a claim for breach of contract and in quantum meruit against Société and/or GAN S.A. It is well-settled that "[a]ctual authority is created by direct manifestations from the principal to the agent," *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.1997) (internal quotation marks omitted), and apparent authority depends on some conduct by the principal, communicated to a third party, which reasonably gives the appearance that the agent has authority to conduct a particular transaction, *see Ben–Reuven v. Kidder, Peabody & Co.*, 241 A.D.2d 504, 661 N.Y.S.2d 28, 29 (1997). As to apparent authority, a principal may be bound by a person's actions if the principal conducts himself in a manner that leads a third party to believe that the purported agent possesses authority. *See Marfia v. T.C. Ziraat Bankasi, New York Branch*, 100 F.3d 243, 251 (2d Cir.1996).

Although the question of Juliard's authority to act on behalf of Société and/or GAN S.A., as alleged in the Amended Complaint, remains very much an issue in this case, the Amended Complaint describes in minute detail the services allegedly rendered by Reiss at Juliard's request: Reiss' contacts with Grimaldi of the GECC Real Estate Division; his consultation with Rosio, the UIS Financial Director; his involvement with Groupe Percier–Allied Partners, the combination of companies established in New York for marketing purposes by the various French companies and Reiss; his frequent interactions with Juliard; his involvement in meetings in New York with Fraizer of GECC's Real Estate Division, Juliard, and Rosio; his meeting at the Hotel Vernet involving, among others, Powers, the GECC representative in Europe and de Chavanne, the chairperson of both Société and GAN S.A.; other meetings in Paris and New York; his work in assisting GECC to prepare a study of the French real estate market; numerous conversations with Grimaldi to maintain GECC's interest; and many other services. Whether these services were actually or apparently authorized by Société and/or GAN S.A. through Juliard, whether Juliard engaged Reiss to perform those services, and whether those services were in fact performed, must abide the resolution of FSIA jurisdiction.

## IX.

In accordance with the foregoing, the judgment of the district court dismissing

the Amended Complaint is vacated, and the case is remanded to the district court for further proceedings consistent herewith.